The 4th District Appellate Court of the State of Illinois has reconvened. The Honorable John W. Turner presiding. Thank you. Good afternoon, everyone. We are here on Witt v. Illinois Human Rights Comm'n and others. That's case number 4-230289. Would counsel for the appellant please identify yourself for the record? Your Honor, Timothy Storm on behalf of Petitioner Dylan Witt. Thank you. And we have two attorneys here for the appellee. Would you identify yourselves for the record? Yes, I'm Dave Neumeister, Assistant Attorney General on behalf of the Human Rights Comm'n and the Department of Human Rights. And I'm Christina Jaramus on behalf of Appellee Woodward, Inc. Thank you. Mr. Storm, are you ready to proceed with your argument? I am, Your Honor. Then please do so. May it please the Court. The issue is whether the Commission's decision sustaining the Department's dismissal of Dylan Witt's charge because he failed to establish a prima facie case of religious discrimination is an abuse of discretion and whether the Commission's factual findings are against the manifest weight of the evidence. Dylan contends that the Commission's decision is an abuse of discretion in that it is arbitrary and capricious because it failed to consider a critical aspect of the matter and rests on an implausible explanation and that certain of the Commission's factual findings are against the between the parties based on the briefing. To establish a prima facie case for religious discrimination, the complainant must show that, one, he falls within a protected class, two, his performance met the employer's legitimate expectations, three, he was subject to an adverse of the protected class more favorably under similar situations and circumstances. I'm sorry to interrupt. I've got a question on one of the factors that you just mentioned, and that is specifically whether or not Mr. Witt met Woodward's legitimate employment expectations. He did not, did he? He received several warnings with respect to his employment performance and indeed was at the final step of a warning when he left for the retreat and then returned on February 12th. I'm sorry, I may have gotten that mixed up, but when he worked on February 12th, I believe he hadn't gone and then he left for the retreat and came back, but at any rate, his performance really did not meet Woodward's requirements, did it? In fact, there's no evidence in the record that his performance did not meet Woodward's legitimate expectations, and here's why. The commission's decision, Woodward terminated Dylan for one specifically stated reason, and that was that he started work about a half hour early on the morning of February 12th. The commission, however, did not in its decision and the respondents in their brief do not point to any evidence of record, any objective evidence of record that Dylan did, in fact, start work half an hour early or early at all on February 12th. The commission's decision and the respondents briefs repeatedly refer to warnings that Dylan had previously received on April 23rd, 2019 and on July 25th, 2020. Both the state and Woodward repeatedly refer to that past discipline over and over in their brief, and in fact, the commission also refers to that over and over in its decision, but indeed, the allegation that Dylan started work early on February 12th, that specifically is the explanation that Woodward advanced as its legitimate non-discriminatory reason why he was fired, but the record doesn't support that as a matter of fact. First, everyone agrees, as a matter of fact, that Dylan arrived at the Woodward facility early on that day, and Woodward has made very clear that arriving at the facility early, but not starting work early, is not a violation of any employment rule or policy. In fact, after the July 25, 2019 discipline, Dylan explicitly promised in writing to arrive at work early, but not to start to work early until his designated shift start time, and Dylan has February 12th. The evidence of record that he did so is simply that Woodward says he did. He was paid for eight and a half hours, not eight hours on that date, isn't that correct, Mr. Storm? He was, his paycheck for that date, or his pay information for that date, indicated eight and a half hours of pay, and your honor will note that the record also states when Dylan received that, he wrote back and said, I didn't work eight and a half hours on that day, I worked eight hours on that day. Again, perfectly consistent with what he has continued to say. So yes, that's another point of evidence, the eight and a half hour pay stub or paycheck for that date, and also Dylan's statement in response that he didn't work eight and a half hours that day, but we also pointed out in our opening brief that Woodward has not provided any objective documentary evidence that Dylan started work early on that day when it easily could have done so. It hasn't provided proof of when Dylan logged into his computer on that day, and the nature of that job is that the employee works on, all of the employees of that type work on the computer, and they log in at their start time. Woodward has never provided timestamp security video showing when he started to work. It has never provided any testimony of co-workers regarding when he started, or anything else of that kind. What they have, the one bit of documentary evidence on timing on that day that we have in the record regarding what Dylan was doing that morning, is an email that Dylan's supervisor sent to him five days later, and Justice Zinoff, you referred to this earlier in your question. When Dylan was still away at the retreat, his supervisor sent him an email on February 17, 2020, five days after the work date in question. In that email, the supervisor asks him, why were you clocked in at 4 55 a.m on 2 12 20? That's found at C29 in the record, incidentally. That email appears to contain a screenshot or something similar showing a quote time in, end quote, of 4 58 a.m. Now, Woodward does not contend, and makes very clear in its brief, that it does not contend that Dylan started work at 4 58 a.m on that day. That is the day, that is the time he arrived at the plant. My point here is this, when Woodward first raised the issue of timing about February 12 with Dylan, that was the email from his supervisor, and it was asking him about what time he arrived at the plant, and even included a screenshot of some sort of security record showing exactly what time he arrived down to the minute. Later, Woodward's concern refocused on what time Dylan started work. Woodward provided objective documentary evidence of exactly what time Dylan entered the plant, but strangely, Woodward never provided anything similar, not anything at all, to demonstrate what it says is the key fact for which Dylan was fired, and which showed that he was, according to them, not meeting their legitimate expectations, which is the time he actually started work that day. Again, Dylan pointed out in his brief that the record doesn't contain any such objective evidence. It's very interesting that neither Woodward's response, nor the state's response, contains any citation to such evidence. Instead, both Woodward and the state focus on the same thing as the commission, that Dylan had previously been disciplined for purported overtime violations, but again, that he may have been disciplined in the past doesn't constitute any evidence that he started work early on February 12, which is why he was fired, according to Woodward. Justice Zinov asked you why the eight and a half hours for which he was paid is not evidence. I'm not sure I understood what your response was to that. Sounds like evidence to me that he worked more than eight hours. Oh, I don't suggest that it's not evidence, Your Honor. What I'm saying is Woodward had the opportunity to provide objective, contemporary evidence about that. Woodward could have paid him for eight and a half hours, nine hours, ten hours, three hours. That doesn't say anything about what time Dylan actually started to work. It's evidence, but it's certainly not the best evidence of when he started to work. When we're talking about the eight and a half hour payment for that day, we can't overlook the fact that Dylan immediately responded. I didn't work eight and a half hours that day. I worked eight hours that day. If the commission had evidence of exactly the time he entered the plant, then undoubtedly it has evidence of exactly what time he started to work, and we haven't seen that. Is it a reasonable inference that if he was paid for eight and a half hours early? I don't think it is necessarily a reasonable inference, and it's not an inference that anybody should have to draw when Woodward has at its disposal all manner of information that it simply could provide to show us that he logged into the computer half an hour early or five minutes early or anything else. That is, in effect, going to be a credibility determination that the department and commission had to make of judging between Dylan's consistent statements that he did not start work early and Woodward's statement that he did start work early, a statement not backed up by objective evidence of the kind I've mentioned, and the department and the commission are not free to make that sort of credibility determination. I'm sorry. Have you finished your answer to Justice Turner's question? I apologize. I don't want to interrupt it. Not at all. I believe I have, Justice. All right. Moving on from there, let's assume for the moment that the requirements to establish a prima facie case of religious discrimination have been articulated, a non-discriminatory reason for terminating Mr. Witt's employment, that being that he, according to Woodward, violated the overtime policy on February 12th after having been disciplined for that. So that's what they as well. The commission determined that Woodward's reason that I just stated was not pretextual. So why didn't the evidence support this? There are other elements here we need to be talking about, correct? Other employees for Woodward? Well, if I understand Your Honor's question, the first part of the question is, why doesn't the evidence support the finding that Woodward's stated reason for firing Dillon was not pretextual? Correct. And my response to that is, frankly, to reiterate a lot of what I have stated coming up to that question, which is that if the reason is, and let's be clear, then the reason, the specific reason that Woodward gave for firing Dillon is he started work a half hour early on February 12th. Now, granted, in the light of previous discipline relating to overtime, but that was the specific precipitating event, allegedly that he started work on February 12th early. Now, if he did not, in fact, start work on February 12th early, which I believe is where the evidence in this case leaves us, then it is necessarily pretextual because it's not true. Well, what about other employees? With respect, were there any other employees? Was there evidence of any other employee who was dismissed for a similar violation? I don't, I think the evidence, the information that Dillon provided was that there were other employees who were engaging in the same behavior, but were not terminated for that behavior. In fact, Dillon, I'm sorry. Go ahead. I was assuming you were going to say something when you weren't going to say it. Dillon provided a list of other employees who he personally had information based upon his observation, had started work early on who could state and testify that they had seen other employees start early and they were not disciplined. But this is part of our second argument on the prima facie case, which is that even though Dillon provided that information to the department, the problem is that the department didn't conduct an adequate investigation of that information. That's not just Dillon's opinion or my opinion. That is the department's assessment of its own conduct. When the department recommended that the commission vacate the department's second dismissal of Dillon's charge for lack of substantial evidence, the department provided a long list of items that required further information as a justification for why the decision should be vacated. There's no evidence that many of the investigative items that the department itself identified as important were ever completed. And that includes such things as following up on these employees who Dillon identified as having started early and having been treated differently than he was, which is to say they committed the same infraction that he was accused of, but they were not terminated or disciplined. And that's the differential treatment that we're talking about here. Petitioner opposed this second request for a remand, but the commission ordered it nevertheless. However, after the department dismissed the petitioner's charge the third time, the petitioner did complain to the commission about the sufficiency of the investigation, but he didn't request a remand at that time for any further investigation. So I'm not sure how strong your argument is with respect to any further evidence not being produced. He certainly could have come up with additional workers who would offer their own testimony. I don't believe the department was in any position or Woodward to force these people to come forward and give testimony to the department, were they? Two things in answer to your question. One, Dillon did provide an extensive list of such employees of the kind you're referring to, and two, Dillon certainly is not in a position to compel them to testify either, but he did what he could do under the circumstances, which was to identify those employees to the department. And he also, as your honor correctly points out, has indicated all along that the department's investigation of that information was insufficient. The commission should have determined that the department's investigation was insufficient, but it didn't do so, and it sustained the dismissal. That's a further error on the commission's part, because even though Dillon identified those investigations, the department itself had previously determined was necessary. The commission then relied on the department's incomplete record to draw the erroneous conclusion, as the commission said, that Dillon did not identify a non-Christian, similarly situated employee who was not discharged under similar circumstances, but in fact he did. And thus, the commission failed to consider a critical aspect of the case, and the commission's decision for that reason was arbitrary and capricious. I believe my time is either up or just about up, I saw, so if there are no further questions, I will conclude without going into further points. Okay, thank you. You will have rebuttal. Mr. Neumeister, you may proceed. Yes, and may it please the court and counsel. Good afternoon again, your honors. I'm Assistant Attorney General Dave Neumeister for the State Respondents. First and foremost, we need to keep in mind that this is a religious discrimination claim, and the focus of it here is on the second and the fourth elements of Mr. Witt's claim. We can discuss either of those in sufficient detail, but what really needs to be stressed up front is the larger point that there was no evidence of any religious animus or discrimination on Woodward's part toward anybody at any time. There were several Woodward supervisors identified as Christian, including Mr. Winseth, who was Witt's immediate supervisor at the time, and the record doesn't show that they experienced or practiced any kind of religious discrimination. Ms. Neumeister, good afternoon. With respect to the point that you're making, would you share with us why you don't think it was necessary for the department and the commission actually to review petitioners, Buddhist employees, co-employees' time records before determining whether there was substantial evidence supporting petitioners' charge of discrimination? I'm happy to. We're talking about Mr. Bailey, who was not a true comparator because the record shows that he was disciplined for something other than violating the overtime policy, which was the mishandling of equipment. If we look at page 195 of the record, it does show that Mr. Bailey's disciplinary record, at least this much of it, was obtained, and it showed that he was written up for mishandling of equipment and had nothing to do with violation of the overtime policy. This has been discussed already in some detail. At some point, the department is conducting its investigation, and a number of items were identified that it was preferable that the obtained appears in their reports. Basically, it's among other places, pages 287, 281, 279 of the record, where it lists the exhibits that they referenced in their reports. Those actual documents, unfortunately, don't appear in the record on appeal. But the overarching point here, is that the department doesn't have to prepare such as a checklist and look at every single item that it was recommended that it obtain, as long as it gets enough. Through obtaining everything that it did, including through all of the documentation that Woodward produced, and there's a reference to that as well. On page 31 of the record, documents relative to the complainant's termination attached here to that Woodward gave the department that just did not appear in the record because of the way that the department assembles this record. But the key here is the document that I pointed out at page 195 of the record. Between that and other documentation and statements that the department gathered, it determined at some point that it had enough information to go forward and present this to the commission as its final decision. There's no requirement that it obtain every single thing, as long as it has enough, especially in its own mind, especially since there's commission review of the materials. I hope that answers your question. Thank you. And continuing, there were several other Woodward supervisors who identified as Christian, including Mr. Winseth, and the record doesn't reflect any discrimination on their part. Winseth said he didn't even know Witt's religion and just told him to have fun at the retreat. And Mr. Witt and another employee held Bible study on Woodward's premises for some time before the discharge, and the record doesn't show that they experienced any sort of negative impact or consequences. And Mr. Stevenson, who attended the same Christian retreat as Mr. Witt, was never disciplined, as far as the record shows us. This logically ties us into the fourth element, which is less favorable treatment than somebody else outside of Mr. Witt's protected class. And he didn't produce any evidence to support that element. And in addition to the absence of any religious animus that we're talking about, two key points. First is the one we've just made about Mr. Bailey. And second, as for other employees who Mr. Witt identified as violating the overtime policy without being discharged, the record doesn't show their religious affiliations. And that's really the key to this religious discrimination case. So there's no evidence that any of these supposedly similarly situated employees fell outside of Mr. Witt's protected class. And for that same reason, there was not substantial evidence that Woodward's stated reason for discharge was a pretext. We've talked about the one piece of hard evidence, the 8.5 hours worth of payment that he received as documented. Woodward is in a position where, and this isn't developed in the record, and it's not a factual representation anyway, but Woodward, if somebody, if Woodward observed somebody working overtime for whatever, however they have identified that, they're obligated to pay them for that time. Whether or not the individual confirms they were working, alleges that they were working off the clock or not. But that's the sort of the nature of the Fair Labor Standards Act under which Woodward has to operate. So the 8.5 hours is hard evidence in the record that, you know, they paid him some overtime because according to their records, that unfortunately don't appear in the record on appeal, although the commission did gather those records, or the department rather did gather those records, that he did work overtime on that date. But the bigger point is that Witt's Christianity didn't motivate this decision because Woodward had accommodated his religious practices before by allowing Bible study on its premises and employing any number of employees identified in the record as Christian without any incidents. And just to speak a little bit more to the completeness or the sufficiency of the department's investigation, it included several items that they obtained in addition to what we've mentioned. The overtime policy that they were supposed to get, the dates of Mr. Witt's discipline and his decision day return, Woodward's clarification between coming to the plant early and starting work early, and Woodward's discharge of four other people for violating the overtime policy with no awareness of their religions. So there was plenty of evidence to establish the fourth element and without any pretext. Whose application was it to interview and get evidence from the names Mr. Witt provided to Woodward? Your Honor, the first part of your question cut off. Could I ask you to please repeat it? Sure. Whose obligation was it or responsibility was it to interview and get evidence from the persons whose names Mr. Witt gave to the department? I'll answer that in two ways. First, when a charge is filed with the department, it's incumbent upon the department to conduct an investigation. And that's what the department did. The record reflects that in terms of the submissions from Mr. Witt and Woodward that went back and forth, both initial and supplementary, and the department's thorough summary of the evidence that it gathered, both in its initial report and its amended report. But that being so, one thing we need to remember at this stage is the department cannot compel individuals to participate and give evidence. We're not at the stage where this is adjudicatory, where an ALJ could issue subpoenas. So even the statements that it gathers are not under oath. So we need to be careful using the word testimony because there are not statements taken under oath. Good point. I apologize. I didn't acknowledge that in my question, but that is a good point that I know we need to be aware of. Thank you. Thank you, Your Honor. And again, you know, the record reflects, you know, in the first report, it noted a number of witnesses who declined to participate. It appears at pages 287 to 93 of the record. And the other thing that we need to keep in mind here, second part of my answer, is that even though the department, with this charge brought to it, has the obligation to investigate and was carrying that out here, that doesn't shift the burden of proof. Mr. Witt still ultimately, as the claimant, bears the burden of proof to come forward with enough to make out a prima facie case. And while it's the department's job to gather evidence in a neutral fashion, it's not the department's job to make out Mr. Witt's case form. The other thing that's important to remember as we're going forward here is that there's nothing in the record to reflect that Mr. Witt was anything other than an at-will employee. He could have been fired for any reason at any time, as long as the reason was not discriminatory. And Woodward didn't have to give him a hearing and was entitled to make personnel decisions as it saw fit, as long as it was not discriminatory. And I submit again that there's nothing in the record here to tie Mr. Witt's termination to religion. The only thing that he brings up, as far as I can discern from the briefing and argument, is the fact that his dismissal happened right after he asked for time off to go on a religious retreat, and he returned from that retreat. But again, the individuals involved in the termination decision were Christians. And the other thing we need to keep in mind with that is that the termination also occurred at the same time that he violated the overtime rule again. And it wouldn't happen same day because Woodward has to conduct its own internal investigation before it decides that they're going to terminate Mr. Witt or make whatever personnel decision they're going to make. And that's what it did for those several days. The and when he comes Mr. Witt returned his first day back after the violation, they talked to him, put him on suspension, and then the final and then the next day they decided that they were going to terminate him. The only thing he has to tie this to religion is just open speculation because it occurred right at the time that he went on this religious retreat. And again, the fact that it was a religious retreat seemed to be of virtually no concern to his supervisor who granted them the time off and told them to have fun. So that's what we really need to keep in mind here is this the nature of the, you know, the procedural posture we're in here where there's no testimony being taken. And so there's nothing in here to show that the commission abused its discretion with that ruling such that no other reasonable person would rule as it did. And at this point, with court's permission, unless there are no further questions, I would turn this over to my co-counsel and ask that you affirm the commission's decision. Thank you. I see no questions. Thank you, Ms. Jaramus, please. Yes, may it please the court. My name is Christina Jaramus and I'm speaking for respondent Woodward. So I do want to answer any specific questions you have. But I also want to expand on what my colleague Mr. Neumeister said. We agree, Woodward obviously agrees with the government respondents. And feel free to interrupt me if you have any other questions. But I just want to fly through a few points that I heard from Mr. Strahm and Mr. Neumeister, if that's okay. Before you do that, you invited the questions and I do have one. How do you respond to opposing counsel's argument and point that there really was no evidence, subjective evidence, in the record that Mr. Witt started his shift early on February 12th? Yeah, I think that's incorrect because the department's report reflects that it did not just rely on the word of agents, as Witt argues. Woodward conducted an internal investigation. And page 196 of the record shows, as you've said, they paid him for 8.5 hours. So they determined that he worked 30 minutes in excess of his shift. Page 286 of the department's, I'm sorry, the record, the department's report, references Woodward's investigation revealed. Page 285 references Woodward's investigation revealed. We have the exhibits that are attached to the department's report. One of those shows that Woodward interviewed Witt, the department looked at the past disciplinary record. The fact that that investigation report and all those attachments are not in the record on appeal does not mean that the department didn't get those things and reference it in its report. It's just by the very nature of where we are that the department doesn't attach position statements in all of the exhibits to the record on appeal. So it's not just, hey, this person said this. There's an investigation reference throughout the appellate record. And just because the department summarized that investigation in its report doesn't mean that that stuff wasn't attached to Woodward's position statement. And we see too, in response to the questionnaire response that Woodward submitted at C-31, discharge notice issued to complainant and other documents supporting respondent's discharge decision, such as time records, screenshots of camera footage. We just said documentation is attached. That isn't in the record on appeal, but that doesn't mean that the department didn't consider it, reference it, and summarize it in its report, and then the commission affirmed based on that. So just because it's not in the record on appeal doesn't mean the department just considered what someone said. So I think that's a misnomer there, and hopefully that answers your question. And also on that point, just because it didn't get every single item, like Mr. Bailey's time card, this isn't a no stone unturned standard. So he could have gotten Bailey's time records, but that wouldn't necessarily be dispositive because it's not against policy just to work overtime or hours outside of your shift. It's about working hours outside of your shift and telling anyone, working hours outside of your shift and not getting prior supervisory approval. And Mr. Strom states that Woodward really focuses on the past discipline. He was not terminated for things that happened long ago that he was previously terminated for, but it's important to look at his termination not in a vacuum because there was a first discipline. There was a last chance agreement. This wasn't just we determined that you worked 32 minutes before your shift without approval, and you were only disciplined because of that. Obviously, they considered his past discipline in making that termination decision, and all that past discipline occurred well before he went on that religious retreat. And I know I'm very short on time here, but I also wanted to reference at C-54, Mr. Witt actually talks about that prior discipline and how he didn't report to anyone that he started working early, didn't want to be paid for it. And that was part of the problem in the past, that it's like you cannot work hours outside of your scheduled work shift without telling anyone because we do have to pay you for that. Suffer or permit someone to work. So that's what happened here is that he again worked hours times 32 minutes before his scheduled work shift without telling anyone. After being warned of that several times, he did that on February 12th, and as a result needed to be discharged for that because he stated that he would not do that. So I think my time is about up. If you have any specific questions, I would love to answer them in my few seconds remaining. I see no questions. Thank you for your argument. Is there any rebuttal? Yes, Your Honor. Thank you. Counsel for Woodward was asked directly on her argument, what is the evidence that Witt started to work early on February 12th? I heard three points of evidence mentioned. One, he was paid for 8.5 hours on that day. Two, Woodward's internal investigation supported that conclusion. And three, his past disciplinary record. We've discussed the eight and a half hours of pay during my argument. I won't go over that again. Two, Woodward's internal investigation. This is an internal investigation that apparently nobody has ever seen. Nobody has ever seen the results of it. There are references to it. Woodward continues to say they conducted an internal investigation, but it's not in the record. I don't know what it concluded. I don't know what it consisted of. And nobody else in this courtroom does either because it's not in the record. And three, his past disciplinary records. There we go again. While Woodward's counsel at once said Dillon was not being terminated for past discipline, here we hear again about how past discipline was a justification for his being terminated, when in fact the only stated justification was starting work early on February 12th. Secondly, the state has indicated that there are no records in the record on appeal actually showing his working time for that day, but there was a representation that the department did gather those records. Again, we don't know that the department gathered those records or exactly what records they gathered because those records are not in the record on appeal. And more to that the state indicated that the department obtained some, but not all of the information that it itself had concluded was necessary to obtain, but the state argues the department doesn't have to obtain every single item that it itself determined it needed to obtain to conduct a complete investigation. That seems inconsistent at best. But counsel, excuse me for interrupting. I'm sorry. Hold on. There's just one second. Hold on. I'm sorry. I apologize. My plug went out. Excuse me. Just one minute. Sure. Okay. I apologize. I didn't want to be operating without all the power I needed here from my Your client did not object that when the commission went ahead after the second remand, if your client had these reservations with regard to the department's investigation, it did not make them known at that time. And the commission then went ahead and made the decision. So I'm a little puzzled as to how you're taking that position now that there was insufficient investigation still third time around and your client didn't register any objection. Your honor, frankly, I'm not sure I understand the question because you referred to the second there was not an objection after this with respect to the second remand. Did I did I miss a petitioner opposed the request for the second one? It was sent back twice, correct? That's that's correct. Okay. Then after the department dismissed the petitioner's charge the third time, the petitioner did complain to the commission about the sufficiency of the investigation. But at that point, he did not request a remand for further investigation. So at this point, it seems to me he would have conceded that the investigation was sufficient. That was done by the department. Your honor, what I can say is that looking at the record, looking at the petitioner's response or request for review, I should say the final time it was he very clearly articulated the department had failed to conduct the investigation that it itself had previously determined was necessary. I don't know what more he could have done than clearly articulate that position, which he did then and we're in exactly the same position right now that if the commission was going to affirm a dismissal based upon that insufficient investigation, the the affirmance would be erroneous. And that's the argument we're still making. So I would just make one final point and well, no time remaining. It can either make one final point or or conclude. We'll give you a minute to make a final point. Thank you, your honor. The state's council was asked whose obligation it was to interview the department, the Woodward employees that Witt had identified. And the state clearly stated it was the department's responsibility. But here's the key. He also said we're not at the stage now where this is an adjudicatory proceeding and there can be a compulsory process. That's true. And if this decision is made, we will have those answers. And that's why we would urge the court to reverse the commission's determination. Thank you. The court thanks the three of you for your arguments. The case is now submitted in the court will stand in recess until further call.